## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**ALFRED BROWN,**

    **Plaintiff,**

    **v.**

**CORIZON HEALTH, et al.,**

    **Defendants.**

**Civil Action No. MJM-23-788**

## MEMORANDUM

Plaintiff Alfred Brown, who is incarcerated at Eastern Correctional Institution ("ECI"), filed an Amended Complaint in this civil rights action against Corizon Health;[1] Paul Matera, M.D.; Ruth Campbell, P.A.; Supervisor Todd Poole; Plant Manager Dan McGarity; and Sergeant R. Nhem (collectively, "Defendants").  ECF No. 7.  Defendants Matera and Campbell (collectively, the "Medical Defendants") filed a Motion to Dismiss or, Alternatively, for Summary Judgment on August 9, 2023.  ECF No. 19.  Defendants Poole, McGarity, and Nhem (collectively, the "State Defendants") filed a Motion to Dismiss or, in the Alternative, for Summary Judgment on September 6, 2023.  ECF No. 22.  Brown opposes the motions.  ECF Nos. 29, 30.  State Defendants filed a reply.  ECF No. 31.  A hearing is not necessary to resolve the pending motions.  *See* Local Rule 105.6 (D. Md. 2023).  For the following reasons, the Court will grant Defendants' motions.

---

[1] This case is stayed as to Corizon Health, Inc. due to ongoing bankruptcy proceedings.  *See* ECF No. 5.  Following disposition of the claims against all other Defendants, any remaining claims against Corizon Health, Inc. will remain stayed and the case will be administratively closed.

## I.  BACKGROUND

### A.  Brown's Allegations

Brown has been incarcerated at ECI since January 2013.  In February 2020, he was hired by Maryland Correctional Enterprises, a division of the Maryland Department of Public Safety and Correctional Services.  ECF No. 7-3 at 5.  On March 16, 2020, Brown was working on cafeteria tables in the spray booth.  *Id.*  When finished, he and inmate Daria Matson took the tables to another area to dry.  *Id.*  The "make shift carrying table they were on collapsed" onto Brown's left foot.  *Id.* at 5-6.

Brown asserts that the collapse occurred for three reasons.  First, because Governor Hogan had declared a state of emergency that same day due to the Covid-19 pandemic, the tables were piled in an unsafe manner that was too heavy for the carrying table.  ECF No. 7-3 at 6.  Second, to avoid cleaning or investing in proper flooring for the spray booth, layers of cardboard were taped to the floor and replaced when worn down.  *Id.*  Third, due to the extreme weight placed upon them and the wear on the cardboard, the wheels of the carrying table were buried into the cardboard.  *Id.*  Todd Poole supervises the operation and, according to Brown, "placed profits over safety."  *Id.*

Following the collapse, Brown was taken to medical in a wheelchair.  ECF No. 7-3 at 6.  X-rays showed that Brown's left foot was broken; he was told it was a single fracture.  *Id.*  PA Ruth Campbell decided to put a splint on his foot because it was taking a long time to find a transport officer to take Brown to the hospital.  *Id.* at 6–7.  He was never transported to the hospital; instead, he was given ibuprofen and sent back to his housing unit with a bottom bunk pass.  *Id.* at 7.  However, Sgt. Nhem refused to move him to a bottom bunk.  *Id.*  Nine days later, PA Campbell informed Brown that his foot was actually broken in several places.  *Id.* at 6.

For the following month, Brown used crutches and "had to hop back and forth to medical" for dressing changes because his skin had been removed during the injury. *Id*. at 7. On April 14, 2020, Brown's foot became infected, and he was given an antibiotic shot. *Id.* The following day he was given pain medication, and another x-ray was taken. *Id.* On sick call, he saw Dr. Paul Matera, who scheduled an x-ray for August 21, 2020. *Id.* Brown filed an administrative remedy procedure ("ARP") grievance on October 1, 2020, alleging medical negligence, which was found meritorious by Warden Walter West. *Id.* Dr. Matera saw Brown on October 28, 2020, and scheduled an MRI, which Brown did not receive until February 2022. *Id.* He had additional x-rays in the meantime, on June 25, July 2, and July 12, 2021. *Id.* On August 19, 2021, PA Bruce Ford extended Brown's bedrest and submitted a consultation request for him to see an orthopedic surgeon.[2] *Id.*

Brown saw Dr. Matera and PA Campbell on September 10, 2021. They determined that Brown had muscle atrophy and his foot had still not healed. *Id.* at 7. Dr. Matera told Brown on November 24, 2021, that he would see an orthopedic surgeon. *Id.* On December 2, 2021, Brown saw Dr. Berger, who scheduled another x-ray for December 15. *Id.*

Brown was in physical therapy with Lindsey Duryea between July and November 2022. *Id*. at 8. He increased his range of motion and was able to remove the splint he had been wearing since his initial injury. *Id.* Regardless, Brown states that he suffers from pain and swelling daily and cannot stand for long periods of time. *Id.*

Separately, Brown also alleges that, due to the Covid-19 restrictions, ECI was on lockdown and eating all three meals in their cells. *Id.* at 8. He asserts that starting on July 6, 2021, inmates

---

[2] Brown notes that he saw PA Ford on March 27 and April 14, 2020; August 19, 2021; and October 12, 2022, but states he was unhelpful and only schedules x-rays. ECF No. 7-3 at 7.

were allowed to return to the cafeteria for meals, but Sgt. Nhem ignored medical orders and refused to feed Brown for seven days. *Id.*

Brown seeks injunctive relief and monetary damages. *Id*. at 5, 8.

**B.  Sgt. Nhem's Declaration**

Sgt. Robin Nhem was, at all times relevant, the Officer in Charge ("OIC") of Housing Unit 3 on the 8:00 to 4:00 shift.  ECF No. 22-2 at ¶ 3.  Sgt. Nhem states that, as OIC, they have no authority to assign inmates to specific beds or cells, which is the purview of the traffic department. *Id.* at ¶ 5.  Once a bottom bunk assignment is processed by the traffic department, it notifies the OIC to move the inmate.  *Id.*  Sgt. Nhem states, "I had no personal involvement with [Brown's] housing assignments."  *Id.* at ¶ 6.  Sgt. Nhem denies refusing to feed Brown at any time and notes having been on leave between July 5 and 8, 2021.  *Id.* at ¶¶ 8, 9.

**C.  Brown's ARPs**

Captain Jason K. Derr, the Acting Litigation Coordinator at ECI, attests that a search of available records shows that Brown filed ARP-ECI-0885-20 on September 29, 2020.  ECF No. 22-3 at ¶ 3.  In that ARP, Brown complains that he did not receive proper care after breaking his foot on March 16, 2020.  *Id.* at 5-6.  The ARP was found meritorious, and Brown did not appeal to the Commissioner of Correction.  *Id.* at 5-8.  Derr further attests that Brown filed only one ARP in 2021, ARP-ECI-1312-21, in which he complained about violation of personal property policies by ECI officers.  *Id.* at ¶ 5; pg. 10-11.  Brown did not name Sgt. Nhem in that ARP, nor did he specifically complain about not receiving meals.  *Id.* at ¶ 5.

**D.  Relevant Medical History**

Dr. Matera attests that Brown "received timely and appropriate medical care for his foot, and the fractures have healed."  ECF No. 19-2 at ¶ 5 (Matera Decl.).  He avers that there was no

reason to send Brown to the hospital when he was initially injured because it was non-emergent and the treatment he received from PA Campbell was the same as would have been provided at the hospital, such as "immobilization with compression wrapping and crutches, ice, x-rays, and analgesic pain medication." *Id.* PA Campbell agrees, attesting that she never considered sending Brown to the hospital. ECF No. 19-12 at ¶¶ 5, 10 (Campbell Decl.).

On March 16, 2020, immediately following the incident, Brown saw RN Alysia Keene, who ordered an immediate x-ray. ECF No. 19-8 at 8–10.[3] She contacted a physician to see Brown the same day and instructed Brown about using cool compresses and immobilizing the injury. *Id.* at 9. Brown reported to PA Campbell that the injury was causing pain and swelling and there were abrasions on his left foot and ankle. *Id.* at 11. Campbell noted that Brown was unable to bear weight and that there was a superficial abrasion on his left foot. *Id.* The wound was cleansed and a non-antibiotic ointment, Silvadene, was applied. *Id.* According to Campbell, "[t]he dorsum of the left foot had swelling and tenderness but was neurovascularly intact with good pedal pulses." ECF No. 19-12 at ¶ 6. Campbell ordered a stat x-ray and "did a wet read;" she interpreted that the left fifth metatarsal had a nondisplaced fracture. *Id.* Campbell splinted Brown's foot to immobilize it and prevent any further injury and ordered Brown to be on bed rest and feed-in status until cleared by a provider. *Id.*; ECF No. 19-8 at 12. Brown was instructed to elevate his foot, to use the crutches provided, and to avoid putting any weight on the foot. ECF No. 19-8 at 12. Campbell gave Brown a 600 mg ibuprofen tablet and ordered ice for the injury four times daily for two days as well as wound care for two weeks. *Id.* Campbell's order also restricted him from using the gym until cleared and ordered that he be assigned to a bottom bunk. ECF No. 19-9 at 2.

---

[3] Citations refer to the pagination assigned by the Court's Case Management and Electronic Case File (CM/ECF) system.

Campbell submitted a nonformulary drug request for 50 mg of Tramadol through March 31, 2020; which was approved.  ECF No. 19-8 at 6–7.

Brown's x-ray showed an "acute fracture at the base of the 4th metatarsal bone with mild angulation at [the] fracture site and an acute fracture of the distal 5th metatarsal bone with mild displacement."  ECF No. 19-12 at ¶ 9; *see* ECF No. 19-11 at 24.  PA Campbell submitted a consultation request to orthopedics.  ECF No. 19-8 at 4–5.  Campbell avers that providers must submit requests for diagnostic tests and offsite specialty visits to Utilization Management ("UM"), which reviews and determines the medical necessity of the request.  ECF No. 19-12 at ¶ 8.  UM either approves the request, seeks additional information, or submits an Alternative Treatment Plan ("ATP") recommending a different course of action.  *Id.*  Site providers can appeal an ATP and then the request is reviewed by three members of UM who determine whether to uphold the ATP or approve the original request.  *Id.*  On March 19, 2020, UM returned an ATP suggesting a follow-up with a podiatrist rather than the orthopedic consult.  ECF No. 19-10 at 2.

On March 25, 2020, Brown saw PA Ford and was informed of the preliminary x-ray results. ECF No. 19-7 at 34–35.  Ford continued the orders for crutches, bed rest, and feed-in status.  *Id.* He also ordered Keflex, an antibiotic for Brown's skin abrasions.  *Id.*

Campbell avers that she evaluated the wound on March 27, 2020, and it was "clean and pink with areas of bleeding."  ECF No. 19-12 at ¶ 11.  She ordered the nurse to change the bandages to DuoDERM for two days and then she would reevaluate whether new bandages were needed. Brown returned to PA Campbell on March 31, 2020; she ordered continued dressing changes.  ECF No. 19-7 at 30.

Brown saw LPN Nikia Howard for a dressing change on April 5, 2020.  ECF No. 19-7 at 29.  She noted there was no sign of infection, and the wound was pink without drainage or color.

*Id.*  Brown returned to PA Ford for a follow-up on April 14, 2020.  *Id.* at 27–28.  Ford gave him an antibiotic injection, Rocephin, and ordered two more shots and the antibiotic Bactrim, noting that there was increased swelling and redness in the wound.  *Id.*  Ford also ordered another x-ray.  *Id.* at 26.  A wound culture and gram stain were also performed.  ECF No. 19-11 at 9.

A second x-ray was performed on April 15, 2020.  ECF No. 19-11 at 23.  It showed "a subacute fracture at the base of the 4th metatarsal bone with mild angulation at the fracture site and a subacute fracture of the distal 5th metatarsal bone with mild displacement" and no evidence of joint dislocation.  ECF No. 19-2 at ¶ 13.  The radiologist noted that the alignment was stable since the first x-ray and there were no significant callus formations.  ECF No. 19-11 at 23.  Dr. Matera saw Brown the same day.  He advised Brown to continue avoiding weight on his foot and submitted a request for a two-week course of Ultram, which was approved.  ECF No. 19-7 at 23–25.

On April 16, 2020, LPN Howard changed Brown's dressings and administered another Rocephin injection.  ECF No. 19-7 at 22.  She did so again on April 18, 2020.  *Id.* at 21.  PA Ford ordered a third round of x-rays on April 23, 2020.  *Id.* at 20.

LPN Howard noted that Brown's wound was healed on May 11, 2020.  ECF No. 19-7 at 19.  PA Campbell evaluated his foot, which was still very swollen with a limited range of motion.  *Id.* at 17.  Campbell noted that a doctor would see Brown after an x-ray and reassess.  *Id.*  The May 15, 2020, x-ray showed an impacted and displaced fifth metatarsal head fracture.  ECF No. 19-11 at 22.

On July 29, 2020, Dr. Matera saw Brown for a provider visit.  Brown reported that his pain and other symptoms were improving but were not resolved.  ECF No. 19-7 at 10.  There was some swelling at the injury site, but it was not tender; Brown had full range of motion in his toes.  *Id.*

7

Dr. Matera ordered a fourth x-ray to ensure there was not a nonunion and rewrapped Brown's foot in an ACE wrap. *Id.* at 9, 10. X-rays were completed on August 19, 2020, finding a subacute fracture of Brown's distal fifth metatarsal bone with mild angulation. ECF No. 19-11 at 21.

Dr. Matera saw Brown again on October 28, 2020. He noted that the x-ray order was meant for comparison with the prior scan to determine the injury's healing status, but it only reported the existence of the fracture. ECF No. 19-7 at 3. Brown was still using crutches and a splint and reported feeling a click occasionally when walking. *Id.* Dr. Matera explained that he likely had a nonunion, which would require an MRI and orthopedics visit. *Id.* A consultation request for an MRI was submitted. *Id.* at 1–2. However, Brown tested positive for the Covid-19 virus on November 12, 2020, and was in isolation until November 16, 2020. ECF No. 19-6 at 33–34. On February 11, 2021, Brown returned on sick call to see RN Lee Anne Taylor about the MRI that was supposed to be scheduled in October. ECF No. 19-6 at 30. Brown reported being in constant pain; however, RN Taylor did not note any swelling or redness. *Id.* She assured him that the MRI was likely rescheduled due to Covid-19 restrictions. *Id.*

Dr. Matera saw Brown for a provider visit on February 17, 2021, and informed Brown that an ATP had been returned in response to the orthopedics consultation request and the MRI request was still pending. ECF No. 19-6 at 29. Dr. Matera ordered another set of x-rays and his "wet read" suggested "a faint callus at #5, and tarsal and metatarsal appeared abnormal or light." ECF No. 19-2 at ¶ 21. Brown declined pain medication and did not have any tenderness at the fracture site, and the scar was well healed. *Id.* The radiologist noted no acute osseous abnormality in the x-ray. ECF No. 19-11 at 19. Dr. Matera submitted another MRI request on March 3, 2021, explaining that he believed the left foot "was osteopenic compared with the right, meaning it had less bone density." ECF No. 19-6 at 26; ECF No. 19-2 at ¶ 22. UM returned an ATP finding that

the x-rays were "unimpressive" and to consider another source of foot pain.  ECF No. 19-10 at 6.

Dr. Matera appealed, urging that additional imaging was necessary.  *Id.* at 5–6.  The ATP was

upheld, and UM physician Dr. Stacy suggested that additional information indicated concern for

osteomyelitis and that a CRP (C-protein reactive) test should be considered.  *Id.*  UM physician

Dr. Dorsey agreed with this recommendation and suggested asking radiology for a comparison of

the x-rays.  *Id.* at 5.  Dr. Matera reported on March 9, 2021, that a comparison x-ray had already

been requested and a CRP ordered, so he would await the results before further evaluation.  *Id.*

Dr. Matera saw Brown again on June 23, 2021, and informed him of the ATP.  ECF No.

19-6 at 20–21.  Brown was still using crutches and could stand but had pain if he tried to walk.  *Id.*

Dr. Matera directed him not to push off on the left foot.  ECF No. 19-2 at ¶ 23.  Brown had a

posterior splint in place and was compliant in the treatment plan.  *Id.*  Dr. Matera said he would

obtain the x-ray comparison but that his lab results showed a normal CRP level.  *Id.*  He ordered

the new x-ray that same day.  ECF No. 19-6 at 19.

X-rays were completed on June 25, 2021, showing a "[s]ub-acute to chronic healing

fracture of 4th and 5th metatarsal bones.  ECF No. 19-11 at 18.  Dr. Matera reviewed the x-rays

with Brown on June 30, 2021.  ECF No. 19-6 at 18.  He noted that the x-ray was supposed to be

of both feet but only the left foot was x-rayed, showing the same fracture.  *Id.*  Dr. Matera

resubmitted the x-ray request.  *Id.* at 17.  The correct x-ray scans were taken on July 12, 2021.

ECF No. 19-11 at 17.  They revealed a healed fracture across the fifth metatarsal.  *Id.*  The

radiologist concluded that there was no significant interval change since June 25, 2021.  *Id.*  Dr.

Matera reviewed the x-ray on July 14, 2021, and observed that it indicated the left foot bone density

was less than the right, but would wait for the official reading before placing an orthopedic

consultation request.  ECF No. 19-6 at 13; ECF No. 19-2 at ¶ 27.

Dr. Matera submitted the orthopedic consultation request on August 11, 2021, explaining in detail the injury and subsequent treatment.  ECF No. 19-6 at 8-9; ECF No. 19-2 at ¶ 28.  On August 12, 2021, Dr. Stacy returned an ATP finding that medical necessity had not been demonstrated because the fracture was healed and did not show evidence of osteomyelitis.  ECF No. 19-10 at 9.  Dr. Matera appealed with Dr. Clem's support.  *Id.*  UM physician Dr. Bartels recommended clinical reevaluation of the foot and ankle.  *Id.* at 8.  Dr. Matera responded that Brown was awaiting an in-house consultation with the podiatrist.  *Id.*  In the meantime, PA Ford extended Brown's orders for crutches and bed rest, and Dr. Matera ordered x-rays for further evaluation, which did not show any change.  ECF No. 19-6 at 2–4, 5–6; ECF No. 19-11 at 16.  Dr. Matera saw Brown again on November 24, 2021.  ECF No. 19-5 at 34.  Brown reported that when trying to walk a few steps, he felt a clicking the area of his fifth metatarsal.  *Id.*

On December 3, 2021, Brown saw podiatrist Dr. Michael Berger for an evaluation.  ECF No. 19-5 at 32–33.  Brown reported persistent pain controlled with Motrin.  *Id.*  Dr. Berger examined Brown, reviewed his prior x-rays, and found that he had a closed, fractured metatarsal. *Id.*  Dr. Berger noted evidence of a "questionable loose body on medial side of 5th MTP joint" and was unsure if the fracture had completely healed.  *Id.* at 33.  He ordered a new set of x-rays and submitted a request for a CT scan.  *Id.* at 29–31.  UM approved the CT scan on January 20, 2022, and scheduled it for February 24, 2022.  ECF No. 19-10 at 12.

Brown saw PA Campbell on December 14, 2021, complaining of pain in his foot.  ECF No. 19-5 at 26–28.  Campbell noted that new scans had been ordered by Dr. Berger and wrote an order for bed rest and feed-in status, no gym or work until cleared by a provider, bottom bunk placement, and crutches for one year.  ECF No. 19-8 at 36.  The December 15, 2021, x-rays showed

no evidence of an acute fracture and "[s]table sequela of 5th metatarsal head fracture from 8/13/2021." ECF No. 19-11 at 15.

On February 15, 2022, Brown saw Campbell to be cleared to return to work at a desk job. ECF No. 19-5 at 19–20.  Brown arrived using crutches and without a shoe or covering on the left foot.  *Id.* at 19.  Campbell told Brown that "he must demonstrate wearing a foot covering before he could be released to work with limitations." ECF No. 19-12 at ¶ 14.  She observed that Brown's "left foot had swelling over the dorsal lateral foot, tender to palpation, instep, tenderness center/fascia, aggravated with flexion and hyperextension of toes." *Id.*  Brown was unable to maintain weight on his left toes or walk unassisted.  *Id.*  Brown returned on February 18, 2022, wearing a shoe and able to stand.  ECF No. 19-5 at 17.  Campbell ordered that Brown could return to work on February 22, 2022, with restrictions including the use of crutches and no prolonged standing.  ECF No. 19-8 at 34.

On February 24, 2022, a CT scan was taken of Brown's lower extremities.  ECF No. 19-11 at 3–4.  The radiologist's conclusions stated that there was no acute fracture or dislocation.  *Id.*  Dr. Matera reviewed the CT report and on March 8, 2022, made a note of the results, concluding that Brown's status was unclear due to the findings.  ECF No. 19-5 at 13–14.  He noted that Brown should be on Dr. Berger's appointment list for the next time he was onsite.  *Id.*  Dr. Matera saw Brown again on July 20, 2022.  *Id.* at 5–8.  Brown was still on crutches with a "feeling of crepitus" in his foot.  *Id.*  Dr. Matera continued Brown's medications and instructed him to avoid any heavy lifting, use his crutches, increase fluid intake, and elevate his foot.  *Id.*

Dr. Berger saw Brown again on July 27, 2022.  He concluded Brown had a closed healed fracture of the left fifth metatarsal shaft and noted that the CT scan did not show evidence of nonunion.  ECF No. 19-5 at 2–4.  He noted that Brown's persistent pain may be due to the soft

tissue. *Id.* He ordered weightbearing as tolerated and recommended physical therapy given Brown's deconditioning from prolonged use of crutches. *Id.* Dr. Berger ordered NSAIDs for pain control and prescribed ibuprofen. *Id.* He also submitted a consultation request for a physical therapy evaluation, which was approved. ECF No. 19-4 at 36; ECF No. 19-10 at 17–20.

Brown had his consultation on August 2, 2022, and the therapist suggested treatment twice weekly for six to eight weeks. ECF No. 19-4 at 31-32. UM approved 12 physical therapy sessions. *See id.* at 27–30. After completion, the physical therapist suggested additional treatment for two to four more weeks. *Id.* at 3-4. Four additional sessions were approved. ECF No. 19-3 at 32.

Dr. Matera saw Brown again on January 25, 2023. ECF No. 19-3 at 14–16. Brown reported that he was still using a crutch but not as often and that he had fallen off a top bunk three months prior. *Id.* After having previously refused a bottom bunk, he now requested it. *Id.* Dr. Matera wrote an order for a bottom bunk until Brown was cleared by medical. ECF No. 19-8 at 31. Brown reported improvement from his physical therapy sessions and that he worked a sitting job with no problems. ECF No. 19-3 at 14–16. Dr. Matera instructed Brown to continue using his crutches, avoid heavy lifting, increase fluids, elevate his foot, and follow his exercise program. *Id.* He was also added to Dr. Berger's appointment list. *Id.*

Brown saw Dr. Berger again on February 9, 2023. ECF No. 19-3 at 10–11. His evaluation noted mild tenderness, and he assessed posterior tibial tendonitis in Brown's left leg. *Id.* Dr. Berger instructed Brown to continue his home exercises and, if there was no improvement, he may consider an MRI to determine if there is damage to the tendon. *Id.*

## II. STANDARD OF REVIEW

Defendants move to dismiss the Amended Complaint for failure to state a claim or alternatively for summary judgment. Under Rule 12(b)(6) of the Federal Rules of Civil Procedure,

a party may seek dismissal for "failure to state a claim upon which relief can be granted . . . ."  To survive the challenge, the non-moving party must have pleaded facts demonstrating "a claim to relief that is plausible on its face."  *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A plausible claim is more than merely conceivable or speculative.  *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022).  The allegations in the complaint, accepted as true, must show there is "more than a sheer possibility that a defendant has acted unlawfully."  *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678)).

When ruling on a Rule 12(b)(6) motion, the Court must accept the allegations in the pleading as true and draw all reasonable inferences in favor of the pleader.  *Williams v. Kincaid*, 45 F.4th 759, 765, 777 (4th Cir. 2022).  But the Court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments."  *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)).  Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard."  *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista, Va.*, 917 F.3d 206, 212 (4th Cir. 2019)).  The Court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses."  *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

"[P]ro se filings are 'h[e]ld to less stringent standards than formal pleadings drafted by lawyers.'"  *Folkes v. Nelsen*, 34 F.4th 258, 272 (4th Cir. 2022) (second alteration in original) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).  Accordingly, the Court must construe pro se pleadings liberally.  *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020), *cert. denied*,

13

141 S. Ct. 1376 (2021).  "[L]iberal construction does not require [the Court] to attempt to 'discern the unexpressed intent of the plaintiff,' but only to determine the actual meaning of the words used in the complaint."  *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (quoting *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006) (en banc)).  Thus, a pro se complaint "still must contain enough facts to state a claim for relief that is plausible on its face."  *Thomas v. The Salvation Army S. Territory*, 841 F.3d 632, at 637 (4th Cir. 2016) (internal quotation marks omitted) (quoting *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016)).

The court's review of a Rule 12(b)(6) motion typically is limited to the pleadings, documents attached to the complaint, and arguments made in the parties' briefs.  *See* Fed. R. Civ. P. 12(b)(6), 12(d); *see also* Fed. R. Civ. P. 10(c).  The Court also may consider judicially noticed facts and documents integral to and explicitly relied on in the complaint when their authenticity is not disputed.  *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015) (citing *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004)); Fed. R. Evid. 201(b).  When the parties present, and the Court considers, matters outside the pleadings on a Rule 12(b)(6) motion, the Court must treat the motion as one for summary judgment under Rule 56, and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).

The Court notified Brown that he had the right to respond to Defendants' motions, that the motions could be construed as ones for summary judgment, and that if Brown did not file a timely and adequate written response, the Court could dismiss the case or enter judgment against him without providing him another opportunity to respond.  ECF Nos. 20, 23.  Moreover, Defendants' motions, which identify summary judgment as potential relief, provided sufficient notice for Brown to have a reasonable opportunity to present relevant evidence in support of his position.

*See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).  Brown has filed responses in opposition to both of Defendants' motions.  ECF Nos. 29, 30.  Thus, the Court is satisfied that Brown has been advised that Defendants' motions could be treated as ones for summary judgment and that he has been given a reasonable opportunity to present materials in response to the motions.  The Court will resolve the motions under Rule 56 where appropriate.

Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in support of its position. Fed. R. Civ. P. 56(c)(1)(A).  Then, "[t]o avoid summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  The opposing party must identify more than a "scintilla of evidence" in support of its position to defeat the motion for summary judgment.  *Id.* at 252.  The Court "should not weigh the evidence." *Perkins*, 936 F.3d at 205 (quoting *Anderson*, 477 U.S. at 249).  However, if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," then summary judgment is appropriate. *Id.* (quoting *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  In ruling on a motion for summary judgment, this Court "view[s] the facts and inferences drawn from the facts in the light most

favorable to . . . the nonmoving party." *Perkins*, 936 F.3d at 205 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996)).

## III. DISCUSSION

### A.  State Defendants' Motion

State Defendants assert that they are entitled to dismissal of the Amended Complaint pursuant to Federal Rule 12(b)(6) or, in the alternative, to summary judgment pursuant to Rule 56 because (1) the State Defendants are immune from suit under the Eleventh Amendment, (2) Brown failed to exhaust his administrative remedies, (3) Brown does not make any allegations against McGarity, (4) Poole is entitled to statutory immunity under the Maryland Tort Claims Act, (5) Brown fails to establish an Eighth Amendment claim, and (6) the State Defendants are entitled to qualified immunity.  ECF No. 22-1.

#### 1.  McGarity's Personal Participation

Title 42, United States Code, Section 1983 provides a cause of action against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  This statute "is not itself a source of substantive rights, but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see also Wahi v. Charleston Area Med. Ctr.*, 562 F.3d 599, 615 (4th Cir. 2009).  Liability under § 1983 attaches only upon personal participation by a defendant in a constitutional violation.  *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).  Other than being named in the caption of the Amended Complaint, McGarity is not mentioned anywhere in Brown's factual allegations.  As such, the Amended Complaint must be dismissed against him.

Brown notes in his opposition that McGarity was named only because he "was in charge of the whole operation."  ECF No. 30 at ¶ 8.  Supervisors may be liable under § 1983 only if the plaintiff shows they "acted personally in the deprivation of [his] rights."  *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (quoting *Bennett v. Gravelle*, 323 F. Supp. 203, 214 (D. Md. 1973), *aff'd*, 451 F.2d 1011 (4th Cir. 1971)).  To state a claim for supervisory liability under § 1983 based on a subordinate's conduct, the plaintiff must allege that (1) the supervisor had actual or constructive knowledge that a subordinate's conduct "posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff"; (2) the supervisor responded in a manner that was so inadequate that it showed "deliberate indifference to or tacit authorization" of the subordinate's conduct; and (3) there was "an affirmative causal link between the supervisor's inaction" and the plaintiff's constitutional injury.  *Timpson ex rel. Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).  Even if Brown had alleged in his Amended Complaint that McGarity was liable under § 1983 for his supervisory role, it would still be insufficient because he fails to provide any facts demonstrating supervisory liability.  *See Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) ((quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

The Amended Complaint shall be dismissed as to any claims against McGarity.

### 2.  Eleventh Amendment Immunity

Under the Eleventh Amendment to the United States Constitution, a state, its agencies, and departments are immune from suits in federal court brought by its citizens or the citizens of another state, unless it consents.  *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  Claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against

the state itself. *Brandon v. Holt*, 469 U.S. 464, 471–72 (1985). The State of Maryland has not waived such immunity for claims brought pursuant to § 1983. Sgt. Nhem and Poole are therefore immune from suit for actions taken in their official capacity. Therefore, to the extent Brown brings any claims against them in their official capacities, those claims are dismissed.

### 3. Exhaustion of Administrative Remedies

#### a. PLRA's Exhaustion Requirement

The Prisoner Litigation Reform Act ("PLRA") provides, in pertinent part: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see also Chase v. Peay*, 286 F. Supp. 2d 523, 528 (D. Md. 2003), *aff'd*, 98 F. App'x 253 (4th Cir. 2004).

The doctrine governing exhaustion of administrative remedies has been well established through administrative law jurisprudence. It provides that a plaintiff is not entitled to judicial relief until the prescribed administrative remedies have been exhausted. *Woodford v. Ngo*, 548 U.S. 81, 88–89 (2006). In other words, exhaustion is mandatory, and a court ordinarily may not excuse a failure to exhaust. *See Ross v. Blake*, 578 U.S. 632, 639 (2016) (citing *Miller v. French*, 530 U.S.

327, 337 (2000) (explaining that "[t]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion") (alteration in original)).  Therefore, a claim that has not been exhausted may not be considered by this Court.  *See Jones v. Bock*, 549 U.S. 199, 220 (2007).

However, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner.  Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants.  *See Bock*, 549 U.S. at 215–216; *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 682 (4th Cir. 2005).

The PLRA's exhaustion requirement serves several purposes.  These include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record."  *Bock*, 549 U.S. at 219; *see also Moore v. Bennette,* 517 F.3d 717, 725 (4th Cir. 2008) (recognizing that exhaustion provides prison officials with the opportunity to respond to a complaint through proper use of administrative remedies).  Incarcerated persons must "pursue administrative grievances until they receive a final denial of their claim[s], appealing through all available stages in the administrative process" so that the agency reaches a decision on the merits.  *Chase*, 286 F. Supp. 2d at 530; *see also Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943–44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust where he did not appeal his administrative claim through all four stages of the BOP's grievance process); *Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or final administrative review after the prison authority denied relief"); *Griffin v. Bryant*, 456 F.4th 328

(4th Cir. 2022) (recognizing PLRA's "strict" requirement to exhaust all available administrative remedies").

Ordinarily, an inmate must follow the procedural steps prescribed by law in order to exhaust his administrative remedies. *Moore*, 517 F.3d at 725, 729; *see also Langford v. Couch*, 50 F. Supp. 2d 544, 548 (E.D. Va. 1999) ("The . . . PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines . . . ." *Woodford*, 548 U.S. at 88. This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Id.* at 90 (quoting *Pozo*, 286 F.3d at 1024). But the Court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see also Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006) (finding that "the inmate cannot be required to exhaust [administrative remedies] . . . when prison officials prevent inmates from using the administrative process").

The Maryland Department of Public Safety and Correctional Services ("DPSCS") has an established "administrative remedy procedure" ("ARP") for use by Maryland state prisoners for "inmate complaint resolution." *See generally* Md. Code Ann., Corr. Servs. ("C.S."), §§ 10-201 *et seq.*; Md. Code Regs. ("COMAR") 12.07.01B(1) (defining ARP). The grievance procedure applies to the submission of a "grievance against an official or employee of the Division of Correction [("DOC")] . . . ." C.S. § 10-206(a). Regulations promulgated by DPSCS concerning the ARP process define a "grievance" to include a "complaint of any individual in the custody of the [DOC] against any officials or employees of the [DOC] arising from the circumstances of

20

custody or confinement." COMAR 12.07.01.01(B)(7). To pursue a grievance, a prisoner confined in a Maryland prison may file an ARP form with the Inmate Grievance Office ("IGO") against any DOC official or employee. *See* C.S. § 10-206(a). When the ARP process provides a possible remedy, it must be followed and completed before an inmate may file a grievance with the IGO. If the prison has a grievance procedure that is approved by the IGO, the prisoner must first follow the institutional ARP process before filing a grievance with the IGO. *See* C.S. § 10-206(b).

The ARP process consists of multiple steps. For the first step, a prisoner is required to file his initial ARP request with his facility's "managing official." COMAR 12.02.28.05(D)(1). "Managing official" is defined by COMAR 12.02.28.02(B)(14) as "the warden or other individual responsible for the management of a correctional facility" and defined under C.S. § 1-101(m) as "the administrator, director, warden, superintendent, sheriff, or other individual responsible for the management of a correctional facility." The ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR 12.02.28.09(B).

The second step in the ARP process occurs if the managing official denies a prisoner's initial ARP or fails to respond to the ARP within the established time frame. The prisoner has 30 days to file an appeal to the Commissioner of Correction. COMAR 12.02.28.14(B)(5).

If the Commissioner of Correction denies an appeal, the prisoner has 30 days to file a grievance with the IGO. COMAR 12.02.28.18; C.S. § 10-206(a); COMAR 12.07.01.05(B).[4] When filing with the IGO, a prisoner is required to include copies of the following: the initial request for administrative remedy, the warden's response to that request, a copy of the ARP appeal

---

[4] If the Commissioner fails to respond, the grievant shall file an appeal within 30 days of the date the response was due. COMAR 12.07.01.05(B)(2).

filed with the Commissioner of Correction, and a copy of the Commissioner's response.   COMAR 12.07.01.04(B)(9)(a).

If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it "without a hearing . . . ."  C.S. § 10-207(b)(1); *see also* COMAR 12.07.01.06(B).  An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review.  C.S. § 10-207(b)(2)(ii).  However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge ("ALJ") with the Maryland Office of Administrative Hearings.  *See* C.S. § 10-208; COMAR 12.07.01.07–.08.  The conduct of such hearings is governed by statute.  *See* C.S. § 10-208; COMAR 12.07.01.07(D); *see also* Md. Code Ann., State Gov't, § 10-206(a)(1).

A decision of the ALJ denying all relief to the inmate is considered a final agency determination.   C.S. § 10-209(b)(1)(ii);  COMAR 12.07.01.10(A)(2).   However, if the ALJ concludes that the inmate's complaint is wholly or partly meritorious, the decision constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the ALJ.  *See* C.S. §§ 10- 209(b)(2), (c); COMAR 12.07.01.10(B).

The statute provides for judicial review.  C.S. § 10-210.  But "[a] court may not consider an individual's grievance that is within the jurisdiction of the [Inmate Grievance] Office or the Office of Administrative Hearings unless the individual has exhausted the remedies provided" in C.S. §§ 10-201 through 10-210.

### b.  March 16, 2020 Injury and Bottom Bunk Order

State Defendants assert that Brown failed to file an ARP regarding either Poole or Sgt. Nhem's alleged misconduct which led to his injury or Brown's failure to be assigned to a bottom

bunk.  ECF No. 22-1 at 9.  They argue that even if ARP-ECI-0885-20 is construed as a grievance against Poole, the claim is still unexhausted.  *Id.* at 10.

Brown's declaration in opposition avers that he did not file an ARP about the incident on March 16, 2020, because "it was made clear to [Brown] that all incidents are reported and handled accordingly.  Because of Covid-19 and the institution shutting down [he] was in the dark about everything.  Officers didn't even come to the tiers other than to count and feed up.  Asking for ARPs wasn't even an option."  ECF No. 30 at ¶ 12.  Brown insists he was "under the impression that the incident was automatically reported and that it would be handled."  *Id.* at ¶ 15.

Relevant here, a prisoner need only exhaust "available" remedies.  42 U.S.C. § 1997e(a). In *Ross v. Blake*, 578 U.S. 632 (2016), the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA."  *Id*. at 635.  In particular, it rejected a "special circumstances" exception to the exhaustion requirement.  *Id*.  But, it reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'"  *Id*. at 636.  "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it."  *Moore v. Bennette,* 517 F.3d 717, 725 (4th Cir. 2008); *see also Younger v. Crowder*, 79 F.4th 373, 380 (4th Cir. 2023) (plaintiff did not fail to exhaust administrative remedies where none were available to him due to ongoing IID investigation).

In *Ross*, the Supreme Court stated that an administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" 578 U.S. at 642 (quoting *Booth*, 532 U.S. at 738).  The Court outlined three circumstances when an administrative remedy is unavailable and an inmate's duty to exhaust available remedies "does not come into play."  *Id.* at 643.  First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or

consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id*. at 643–44. The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644.

Brown's assertions that he believed his injury would be independently reported and handled are insufficient to show that administrative remedies were not available to him. Brown provides no evidence to support his claim, and even if the Court assumes that some relevant incident report was created, any such report would not demonstrate that the ARP process was a dead end, incapable of use, or that Brown was otherwise thwarted by the prison administration from filing an ARP. The Court is also unpersuaded that Brown was unable to file an ARP due to the facility's lockdown procedures during the Covid-19 pandemic. Brown offers no evidence to support his feeling or belief that prisoners' limited interaction with prison staff during this time removed the option of submitting grievances.

Accordingly, the Court finds that Brown failed to exhaust his administrative remedies as to his claim that Poole's misconduct led to his work injury.[5] Additionally, the record shows that Brown failed to file any ARP regarding his denial of a bottom bunk placement, and Brown does not deny this fact. As such, this claim against Sgt. Nhem is also unexhausted and must be dismissed.

---

[5] The Court is not inclined to construe ARP-ECI-0885-20 as a grievance against Poole because Brown specifically states that he chose not to include any of the State Defendants in that ARP as it concerned a medical issue. *See* ECF No. 30 at ¶ 11.

### c.  Refusal to Feed

State Defendants also contend that Brown failed to file any ARP concerning his claim that Sgt. Nhem refused to feed him for a week beginning in July 2021.  ECF No. 22-1 at 10–11.  Brown acknowledges that the record shows only one ARP filed by him in 2021 and that it did not concern his claim against Sgt. Nhem.  ECF No. 30 at ¶ 10.  Instead, he states that the dates regarding his claim "may have been off" and claims that Sgt. Nhem "left a note inside the control center that said to not feed [Brown].  And her word [was] honored, this was carried out by: Sergeant Waters, Ofc. Whitlock, Ofc. Fischer, and Ofc. Merrit.  Because of Sgt. Nhem's orders even on the days when she wasn't here."  *Id.* at ¶ 13.  Brown attaches ARP-ECI-369-22, in which he complains about several days in March 2022 that Sgt. Nhem allegedly refused to feed him.  ECF No. 30-1 at 1–3.  Even if Brown misstated the dates of his claim, the Court cannot address new claims such as those raised in his declaration because an opposition to a dispositive motion is not a vehicle for amending a pleading.  *See Whitten v. Apria Healthcare Grp., Inc.*, Civ. No. PWG-14-3193, 2015 WL 2227928, at *7 (D. Md. May 11, 2015); *Woodbury v. Victory Van Lines*, 286 F. Supp. 3d 685, 692 (D. Md. 2017) (stating it is axiomatic that a plaintiff may not use their memorandum in opposition to amend the complaint); *Allegis Group, Inc. v. Bero*, 689 F. Supp. 3d 81, 142 (D. Md. 2023) (same); *Equal Rights Ct. v. Niles Bolton Assoc.*, 602 F.3d 597, 603 (4th Cir. 2010) (amendment of complaint may be denied when the amendment is prejudicial to the opposing party because it is belated and changes the nature of the litigation).  Brown's claims that Sgt. Nhem and other officers refused to feed him in 2022 will not be addressed in the context of this case.  Brown did not file an ARP regarding his 2021 allegations.  Thus, Brown failed to exhaust his administrative remedies as to his claim that Sgt. Nhem refused to feed him in 2021.

State Defendants' Motion, construed as a motion for summary judgment, shall be granted as to Brown's unexhausted claims. The unexhausted claims shall be dismissed without prejudice to avoid foreclosing suit in the future should exhaustion be completed. *See Moss v. Harwood*, 19 F.4th 614, 623 n.3 (4th Cir. 2021) (affirming district court order granting motion for summary judgment on issue of exhaustion of administrative remedies but dismissing plaintiff's unexhausted claim without prejudice) (citing cases).

### B.  Medical Defendants' Motion

The Medical Defendants concede that Brown's injury presented an objectively serious medical need. ECF No. 19-1 at 21. They argue, however, that there is no evidence showing that a delay in medical care put Brown at a substantial risk of serious harm or that they were otherwise deliberately indifferent to Brown's medical need. *Id.*

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017).

To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Anderson*, 877 F.3d at 543. Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison

staff were aware of the need for medical attention but failed either to provide it or to ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834–37 (1994); *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017); *King*, 825 F.3d at 218; *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

If the required subjective knowledge is established, a defendant may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *see also Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016) ("[A] prison official's response to a known threat to inmate safety must be reasonable."). Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)); *Jackson v. Lightsey*, 775 F.3d 170, 179 (4th Cir. 2014) (physician's act of prescribing treatment raises fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk). Although "a prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's serious medical need." *De'lonta v. Johnson*, 708 F.3d 520, 526

(4th Cir. 2013) (transgender inmate stated plausible claim in alleging defendant's refusal to evaluate her for gender reassignment surgery where current therapy failed to alleviate urge for serious self-harm).

Based on the record presented, the Court cannot find that either PA Campbell or Dr. Matera were deliberately indifferent to Brown's injury.  Brown's primary allegation against Campbell is that she failed to send him to the hospital for his foot injury.  The record shows, however, that Campbell provided Brown with extensive care immediately following his injury on March 16, 2020.  Campbell examined the injury, ordered an immediate x-ray, cleaned and treated the abrasion, splinted Brown's foot, provided ibuprofen, requested narcotic pain medication, instructed Brown on using crutches and elevating his foot, ordered ice and wound care, submitted a request for an orthopedic consultation, and issued instructions that Brown be excused from work, be on bed rest and feed-in status, be restricted from the gym, and be placed in a bottom bunk assignment for one year.  Both Campbell and Matera aver that this is the same treatment that would have been provided had Brown been transported to a hospital.  At best, Brown's assertion that he should have gone to the hospital simply presents a disagreement with Campbell's decision.  "Disagreements between an inmate and a [medical personnel] over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)).

As to the follow-up care provided by Campbell, she neither delayed nor denied Brown medical treatment.  Although Campbell's request for an orthopedic consultation was denied, she continued to review his wound care on the few occasions she was his provider and changed the type of bandages used as the wound healed.  Although Brown later developed an infection, there is no evidence that it was a result of any misconduct on Campbell's part or that she oversaw the

administration of the antibiotics provided to eliminate the infection.  The Court finds that there are

no genuine issues of material fact as to whether Campbell acted recklessly with regard to Brown's

injury or was otherwise deliberately indifferent to his medical need.  Nothing in the record shows

that her actions were taken "for the very purpose of causing harm or with knowledge that harm

[would] result." *Farmer*, 511 U.S. at 835.  Campbell is therefore entitled to summary judgment in

her favor.

As to Dr. Matera, the record shows that he continuously pursued imaging and testing to

monitor Brown's foot fracture and to diagnose the cause of Brown's ongoing pain.  Brown's

medical records show that Dr. Matera filed several requests for consultations and imaging and

strongly advocated for those requests through the appeals process with UM.  Brown's main

contention is that he did not ultimately see an orthopedist or receive an MRI as Dr. Matera

originally requested.  However, this fact does not establish deliberate indifference on Dr. Matera's

part.  He can only provide the care approved by UM.  Even though the orthopedic consultation

was denied, Dr. Matera did have Brown evaluated by a podiatrist who submitted requests for

physical therapy sessions.  Brown complains that the eight weeks of physical therapy, which was

the minimum requested, did nothing for the pain and swelling.  ECF No. 29 at 3.  However, this

assertion does not establish any recklessness or deliberate indifference by Dr. Matera and, in any

case, is contradicted by Brown's own reports to providers.  Brown also asserts that his pain was

not managed by the medications provided by Dr. Matera and that he had rejected an offer of

ibuprofen on one occasion because it was not working.  *See* ECF No. 29-1 at 3.[6]  Still, he fails to

demonstrate that Dr. Matera acted recklessly or with deliberate indifference.  Dr. Matera requested

---

[6] Attached to Brown's declaration is a "Statement of Disputed Factual Issues" which asserts numerous questions related to the issues raised by Brown's claims but sets forth few facts supporting his claims, none of which create a genuine dispute of material fact.

narcotic pain medication early in Brown's recovery, and the record otherwise shows that he pursued several avenues to determine the cause of Brown's ongoing pain and to relieve it through pain medication and physical therapy.  Although Brown's medical records demonstrate that his recovery process was long and painful, Dr. Matera responded reasonably, "even if the harm ultimately was not averted."  *See Farmer*, 511 U.S. at 844.  Therefore, Dr. Matera is entitled to summary judgment in his favor.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motions are granted.  The Amended Complaint is dismissed without prejudice as to McGarity, Poole, and Sgt. Nhem.  Summary judgment is granted in favor of Campbell and Dr. Matera.

A separate Order follows.


  9/23/24                                                    /S/
Date                                          Matthew J. Maddox
                                              United States District Judge